E. Wesley **HAMMOND, Charles E. Shain, Deane C. Avery, Evan Hill and Walter Baker, Trustees of the Day Trust**

v.

**UNITED STATES of America.**

**Civil No. H 82–264.**

United States District Court, D. Connecticut.

March 23, 1984.

---

Mark R. Kravitz, Edwin A. James, Stacey Jackson Perkins, Wiggin & Dana, New Haven, Conn., for plaintiffs.

D. Patrick Mullarkey, Karen B. Brown, U.S. Dept. of Justice, Tax Div., Civ. Trial Section, Northern Region, Washington, D.C., for defendant.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge.

In 1916, Theodore Bodenwein, owner of *The Day*, a newspaper he had published in New London, Connecticut since 1891, expressed his "earnest hope [that] *The Day*, unlike us poor mortals, will be able to go on forever." Stipulation of Facts ("Stip.") ¶ 7 (filed May 9, 1983). By 1930, however, the publishing industry was increasingly

inhabited by regional and national publishing chains that expanded by acquiring small local newspapers. *Id.* In 1938, Bodenwein executed a will (the "Will"), establishing the Day Trust (the "Trust") to hold the stock of the Day Publishing Company. Stip., Appendix, Exhibit A, Article Fourth ("Exhibit A"). The Trust provided a structure of corporate governance for *The Day* reposing control in a group of five trustees (the "Trustees"), two of whom manage the day-to-day operations of the newspaper. *Id.* By this arrangement, Bodenwein sought to ensure that *The Day* would continue to serve future generations of southeastern Connecticut residents and remain "a leading factor in the growth, development and improvement of the city and vicinity and the happiness and prosperity of the people." *Id.*, Article First.

Bodenwein devoted the better part of his life to establishing *The Day* as "a recognized institution in the community," Stip. ¶ 5, and under his tutelage circulation of the newspaper increased fivefold. Stip. ¶ 6. Yet Bodenwein was also concerned with fostering relations between *The Day* and the people of New London. As his newspaper grew, so did its involvement in community affairs. Stip. ¶ 5. In keeping with this tradition of public service, Bodenwein provided in his Will that profits of the Day Publishing Company not utilized by the newspaper should be transferred annually by the Trustees to a separate trust, the Bodenwein Public Benevolent Foundation (the "Foundation"). Exhibit A, Article Fifth. The Foundation was directed to distribute these funds each year to public and charitable entities in the New London vicinity. *Id.*

The Trustees maintain that in the forty-five years since Bodenwein's death *The Day* has continued to play the role he envisaged for it—a "champion and protector of the public interest" which is "more than a business enterprise." Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Plaintiffs' Memorandum") at 1 (filed May 9, 1983); *see* Exhibit A, Article First. Nevertheless, the endurance of Bodenwein's unique legacy has been cast into doubt in recent years by the Internal Revenue Service (the "IRS"), which has attempted to subject the Trust to provisions of the Internal Revenue Code (the "Code" or "I.R.C.") enacted more than a generation after Bodenwein's death to combat perceived abuses by tax-exempt charitable organizations. Stip. ¶ 28. Among other things, these so-called "private foundation rules," [1] adopted by Congress in 1969, impose a confiscatory 200 percent tax on "exclusively charitable" trusts whose ownership of an incorporated business enterprise exceeds certain percentage limitations. If, as the Government argues, the Trust is sub-

---

**1.** The principal statutory provisions governing private foundations are those contained in sections 4940 through 4945 of the Code.

Briefly, and in general, section 4941 imposes taxes on defined acts of "self-dealing" between a private foundation and certain "disqualified persons"—notably substantial contributors to the private foundation and persons related to such contributors. Section 4942 requires a private foundation to distribute five percent of the fair market value of its non-charitable assets annually, without regard to the private foundation's net income. In the event that a private foundation fails to meet the five percent minimum, a 100 percent penalty tax is imposed on the shortfall. Section 4943 imposes a 200 percent penalty tax on the business holdings of a private foundation which, together with all disqualified persons, owns more than 20 percent of a corporation. With respect to entities such as the Trust, which owned more than 20 percent of a corporation on May 26, 1969, the permissible percentage of ownership is raised to 35 percent and divestiture of excess business holdings is not immediately required. Sections 4944 and 4945 impose excise taxes on a private foundation that makes investments which jeopardize its tax-exempt charitable purposes, *e.g.*, expenditures for propaganda or lobbying or grants to other private foundations.

To finance the audit procedures necessary to enforce these provisions, section 4940 imposes a four percent (now two percent) excise tax on the net investment income of a private foundation. *See* Revenue Act of 1978, Pub.L. No. 95–600 § 520, 92 Stat. 2763, 2884 (1978). It is this excise tax which is directly at issue in this litigation.

*See generally* 4 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶¶ 101.1–101.2 (1981); Parker, *Public or Private Foundation—The Evolving Tests,* 37 N.Y.U.Inst. on Fed.Tax'n, ch. 25 (1979).

ject to these private foundation rules, *see* Memorandum of Law in Support of Defendant's Cross-Motion for Summary Judgment ("Government's Memorandum") at 15–16 (filed June 9, 1983), the Trustees would be forced to sell *The Day*, in all likelihood to a national or regional publishing chain, in direct contravention of Bodenwein's stated desire to preserve *The Day* as an autonomous, locally-controlled newspaper.[2]

While this action ostensibly is concerned only with $2801 in federal excise tax paid on the net investment income of the Trust for the year ended December 31, 1980, it has ramifications extending well beyond a possible refund of this relatively insignificant sum. It is not disputed that a determination that the Trust is "exclusively charitable" would subject it to the panoply of rules governing private foundations, not simply the excise tax on net investment income, and that compliance with these private foundation rules would result in termination of the Trust and the transfer of effective control over a newspaper with net operating revenues in 1982 of approximately $10 million and assets in excess of $5 million. *See* Stip., Exhibit G–6. The Trustees contend that the Trust is not "exclusively charitable" and thus that it fits within the exemption provided by the private foundation rules for so-called "split-interest" trusts created prior to May 27, 1969. If the Trustees are correct, the private foundation rules have no application to the Trust and the Trustees must be permitted

to continue publishing *The Day* as they have since Bodenwein's death in 1939.[3]

## I.

Under the provisions of the Will, the Trust assumed control of *The Day* upon Bodenwein's death on January 12, 1939. Stip. ¶ 1. The Trust holds virtually all of the issued and outstanding shares of stock of the Day Publishing Company,[4] which owns and publishes *The Day*, an independent daily newspaper in New London, Connecticut. Stip. ¶ 8. *The Day* is a successful and respected newspaper, acclaimed for its contributions to the City of New London and surrounding area. Stip. ¶ 4. The income of the Trust consists solely of dividends paid by the Day Publishing Company. Stip. ¶ 20.

Bodenwein directed that income of the Trust not consumed in the operation of the newspaper or the maintenance of reserves for its benefit should be paid over annually to the Foundation, the second testamentary trust created under the provisions of the Will. Stip. ¶ 8. The Foundation was in turn directed to distribute the funds it received from the Trust each year to members of Bodenwein's immediate family during their lifetimes, as well as to local public and charitable organizations. Specifically, nine-tenths of the net income and principal of the Foundation was to be paid to Bodenwein's wife and two children and to the survivor and survivors of them, with the remaining one-tenth to be expended for public, religious, charitable, scientific, liter-

---

**2.** *See* note 14, *infra*, and accompanying text.

**3.** In ruling on the cross-motions for summary judgment, the court has relied on the lengthy joint Stipulation of Facts (filed May 9, 1983). The parties each maintain that there is no "genuine issue as to any material fact," Rule 56(c), Fed.R.Civ.P., and no controversy as to the inferences to be drawn from the facts in evidence, *see Schwabenbauer v. Board of Education*, 667 F.2d 305, 313 (2d Cir.1981). The case is therefore appropriate for summary judgment.

In reaching its decision, the court has also considered the comprehensive memoranda filed by the parties, as well as extensive oral arguments of counsel in open court and on the record at a hearing held June 27, 1983.

·**4.** Upon Bodenwein's death, the Trust received all of the issued and outstanding shares of stock of the Day Publishing Company, with the exception of a few shares owned by directors of the Day Publishing Company dating back to a time when each director of a Connecticut corporation was required by law to own at least one share of the corporation's stock. Stip. ¶ 8. The stock of the Day Publishing Company continues to be the Trust's only asset, apart from funds held from time to time by the Trust pending distribution, reserves maintained for the benefit of *The Day* or monies needed to pay administrative expenses. Stip. ¶ 19; Stip., Exhibits G–1 to G–6.

ary or educational purposes in any town or city in Connecticut in which *The Day* had a substantial circulation. Exhibit A, Article Fifth; Stip. ¶ 23. When Elizabeth B. Miles, the last survivor of the wife and two children of Theodore Bodenwein, died on November 20, 1978, Stip. ¶ 22, all of the net income and principal of the Foundation became payable for public and charitable purposes under the terms of the Will. Stip. ¶ 24. In 1979, the Hartford National Bank (now the Connecticut National Bank), trustee of the Foundation, applied for and received from the IRS a determination that as a consequence of the death of Elizabeth Miles the Foundation had become a tax-exempt charitable organization described in section 501(c)(3) of the Code and a private foundation described in section 509 of the Code. Stip. ¶¶ 25–26. Thus, the Foundation is subject to all of the restrictions imposed on private foundations. Stip. ¶ 26.[5]

The Will directs the Trustees, two of whom must be employed exclusively in publishing *The Day*, to manage the newspaper with the attention to quality that characterized Bodenwein's ownership.[6] Exhibit A, Articles First and Fourth. To accomplish this aim, the Will authorizes the Trustees to withhold net income of the Day Publishing Company from distribution to the Foundation and to expend those funds on behalf of the newspaper. The Trustees are also empowered to establish reserves out of the income of the Trust or the Day Publishing Company for the benefit of *The Day, id.*, Article Fourth,[7] and to dissolve

---

**5.** *See* notes 12–18, *infra,* and accompanying text.

**6.** *The Day* has experienced steady growth since 1939, as indicated by the following comparative statistics:

|  | 1930 | 1955 | 1981 |
|---|---|---|---|
| Circulation | 14,386 | 24,300 | 35,830 |
| Gross Yearly Business | $350,308 | $1,174,305 | $9,149,064 |
| Average Number of Pages | 18 | 24 | 46 |
| Annual Newsprint Usage | 611 tons | 1,304 tons | 2,922 tons |
| Number of Full-Time Employees | 52 | 101 | 181 |
| Annual Payroll | $101,504 | $511,783 | $4,013,989 |

Stip. ¶ 11.

**7.** Article Fourth of the Will authorizes the Trustees to make expenditures directly from the Trust to or on behalf of *The Day* or to establish reserves within the Trust to accomplish Bodenwein's goals for the newspaper.

However, in conformity with Bodenwein's instruction to avoid unnecessary taxes, *see* Exhibit A, Article Eighth, the Trustees have, with a single exception, established reserves within the Day Publishing Company and directed it to make expenditures on behalf of *The Day* prior to declaring dividends. If dividends were paid first to the Trust and the money then channeled back into the newspaper, the Day Publishing Company would be taxed twice on the same income. Moreover, if the Trust accumulated dividend income for later distribution to *The Day*, the Day Publishing Company would also be liable for taxes paid by the Trust under section 641 of the Code with respect to such accumulations. *See* 3 B. Bittker, *supra,* ¶ 81.5 (explaining so-called "throwback" rules relating to delayed distribution of accumulated income by complex trusts). This explains why the Trust "during the year in issue held or applied all of its net income for the benefit of a charity [, *i.e.,*] the

Foundation." Government's Memorandum at 21.

Contrary to the Government's suggestion, *id.* n. 11, the ability of the Trustees to establish reserves within the Day Publishing Company is constrained in a number of ways. First, the Day Publishing Company must pay dividends sufficient to enable the Trust to distribute $25,-000 per year to the Foundation, as required by the Will. Second, a nominee of the Connecticut National Bank serves as a Trustee and presumably would oppose maintenance of unnecessarily large reserves by the Day Publishing Company. Third, section 531 of the Code imposes a substantial accumulated earnings tax on corporations which accumulate earnings and profits "beyond the reasonable needs of the business." *See* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶¶ 8.01–8.09 (4th ed. 1979). Finally, the Connecticut Attorney General is obligated to represent the public interest in protecting legacies or devises intended for public or charitable purposes, Conn.Gen.Stat. § 3–125, and could proceed against the Trustees if they violated duties imposed on them by the Will to the detriment of the Foundation.

the Day Publishing Company and hold the assets of the newspaper directly if that would be advantageous from a tax standpoint. *Id.*, Article Eighth.

> The Will specifically directs the Trustees to so manage said newspaper or newspapers as to provide liberal compensation and various forms of assistance and rewards, such as insurance, bonuses, and pensions, to its employees; to pay sufficient salaries to assure a high type of executives and skilled writers and workmen; to make provision for providing in the course of time a new building to house the paper and such other tenants as they consider it desirable to provide space for, such building to be distinctive in character, a credit to the City architecturally, and an evidence of a farsighted policy; to constantly improve and maintain the mechanical plant used for publishing the paper; to maintain reasonable reserves for all of the above and for unforeseen contingencies, including taxes
> . . . .

*Id.*, Article Fourth.

The Will recites that expenditures and the maintenance of reserves for the benefit of *The Day* to achieve Bodenwein's aims are "in every respect at the discretion of said Trustees," although the Trustees were to be mindful of Bodenwein's desire that the Foundation receive sufficient funds to support his wife and children during their lifetimes. *Id.* The Will contains no instruction to the Trustees to maximize funds available to the Foundation for charitable and public contributions.

In the Will, Bodenwein directed that stock of the Day Publishing Company not be sold on a piecemeal basis. The Trustees are empowered to sell all of the stock, but only in limited circumstances, namely, if *The Day* ceases to be published in New London, Connecticut or if the Trust fails in any two successive years to distribute $25,000 to the Foundation. *Id.*[8] Upon termination, assets of the Trust are to be liquidated and any proceeds distributed to the Foundation. *Id.*

The original Trustees were comprised of the directors of the Day Publishing Company at the time of Bodenwein's death. Stip. ¶ 9. Since that time, with a single exception, Trustees have also sat on the Board of Directors of the Day Publishing Company during their tenure as Trustees. *Id.* The Will does not require that members of Bodenwein's family run the newspaper, sit on the Board of Directors of the Day Publishing Company or serve as Trustees. The Will states only that "at some future date" Bodenwein's son, Gordon, might be considered for employment as publisher of *The Day* and appointment as a Trustee. Exhibit A, Article Fourth. Gordon Bodenwein and Bodenwein's daughter, Elizabeth B. Miles, both served at various times as directors of the Day Publishing Company and as Trustees.[9] Stip. ¶ 10. Gordon Bodenwein died in 1967 and Elizabeth Miles died in 1978; neither was survived by any children. *Id.*

The Trustees, in keeping with Bodenwein's wishes, have participated actively in the management of *The Day*. Affidavit of E. Wesley Hammond (the "Hammond Affidavit") ¶ 5 (filed May 9, 1983);[10] *see* Plain-

---

**8.** Over the past ten years, the Trust has distributed between $130,000 and $150,000 each year to the Foundation. Stip. ¶ 20.

**9.** Gordon Bodenwein was employed by *The Day* as an editorial writer in the 1940s, but resigned from the newspaper in 1950. He was named a director of the Day Publishing Company and a Trustee in 1942. Due to disputes with other directors and Trustees, he was not re-elected as a director in 1951. He remained a Trustee until his death in 1967. Elizabeth B. Miles was named a director in 1967 and a Trustee in April 1978, positions which she held until her death in

November 1978. She was never employed by the Day Publishing Company. Stip. ¶ 10.

**10.** The Government has not disputed the facts set forth in the Hammond Affidavit. "[U]ndisputed statements contained in the moving party's affidavits are taken as true" for purposes of a motion for summary judgment. *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069, 1081 (N.D.Cal.1979); *accord, Woods v. State,* 469 F.Supp. 1127, 1129 n. 2 (S.D.N.Y.) (Weinfeld, J.), *aff'd without opinion,* 614 F.2d 1293 (2d Cir.1979).

tiffs' Memorandum at 28–30 (citing examples of such participation contained in minutes of Trustees' meetings). The Trustees' monthly meetings are addressed to the workings of *The Day,* including personnel matters, capital expenditures and editorial policies. *See* Stip., Exhibit B. As Bodenwein intended, the Trustees have provided liberal compensation to employees of *The Day,* Stip. ¶¶ 14–15, expanded the newspaper's building and improved its mechanical equipment, Stip. ¶¶ 16–17,[11] and maintained reserves in the Day Publishing Company and the Trust to meet the capital needs and operating requirements of the newspaper. Stip. ¶ 18; Hammond Affidavit ¶ 6. As of December 31, 1982, the Day Publishing Company had retained earnings of $2,680,432 to provide for the newspaper as Bodenwein directed in Article Fourth of the Will. Stip. ¶ 18; *see* Stip., Exhibits G–1 to G–6.

## II.

In 1979, the Trustees applied to the IRS for a determination that the Trust had not become subject to the private foundation rules as a result of the death of Elizabeth B. Miles. Stip. ¶ 27.[12] The Trustees asserted that *The Day,* a commercial newspaper, had a continuing interest in the Trust, and thus that the Trust was not "exclusively charitable." Accordingly, the Trustees maintained that the private foundation rules were inapplicable to the Trust.

In 1981, the IRS determined that the Trust was "exclusively charitable" and therefore governed by the private foundation rules. Stip. ¶ 28. Without conceding the validity of the IRS's position, the Trustees submitted a 1980 tax return for the Trust and paid $2,801 in excise tax on the Trust's net investment income under section 4940 of the Code. Stip. ¶ 30; *see* Stip., Exhibit N.

The Trustees applied for a refund of the $2,801 based on their contention that the Trust is not "exclusively charitable" and thus not subject to the excise tax levied on net investment income of private foundations. Stip. ¶ 31; Stip., Exhibits P and Q. The IRS did not rule on the refund claim, Stip. ¶ 31, and the Trustees brought this action to recover the $2,801 in excise tax, plus interest. Stip. ¶ 36; *see* I.R.C. § 6532(a); *Register Publishing Co. v. United States,* 189 F.Supp. 626, 627–628 (D.Conn.1960) (Timbers, J.).[13]

While this action seeks only a refund of the excise tax, it implicates concerns more substantial than the tax liability of $2,801 immediately at issue. A decision that the Trust is an "exclusively charitable" trust would subject it to the full array of rules governing private foundations. As noted previously, compliance with these private foundation rules would require the sale of *The Day,* in all likelihood to a regional or national publishing chain. Certified Official Transcript of Hearing of June 27, 1983 (filed Sept. 13, 1983) ("Tr.") at 19–23, 44–45.[14] The Trustees argue that this is precisely the result Bodenwein sought to avoid

---

**11.** Over the last 14 years, the Trustees have expended approximately $4 million on improving the physical plant and equipment of *The Day.* Stip. ¶ 17; *see* Stip., Exhibit F.

**12.** It is not disputed that since the death of Bodenwein's last survivor, in November 1978, the Foundation has been a tax-exempt charitable organization described in section 501(c)(3) of the Code which is subject to the private foundation rules. Stip. ¶¶ 25–26; *see also* notes 13–18, *infra,* and accompanying text.

**13.** The parties have stipulated that jurisdiction over this action is conferred by 28 U.S.C. § 1346(a)(1) and that the Trustees have complied with all requirements for the institution of a refund claim pursuant to I.R.C. § 7422. Stip. ¶ 3.

**14.** The Court: Plaintiff[s' counsel] has argued, as you will recall, that the practical effect of granting your motion for summary judgment would be to compel the sale of The New London Day.... He suggests that, right? Mr. Mullarkey: Yes.
The Court: Let's assume for the argument that that's the case. Let's assume that ... that would be the actual effect of the Government's success on this motion. Do you agree with that?
Mr. Mullarkey: Yes, your honor. There is no question in my mind that that would be the effect of it.
The Court: That would be the effect?
Mr. Mullarkey: Yes, your honor.
Tr. 44; *see* Stip. ¶ 12; Plaintiffs' Memorandum at 56–57.

when he created the Trust over 40 years ago. Plaintiffs' Memorandum at 2.

### III.

In the Tax Reform Act of 1969, Pub.L. No. 91–172 § 101(b), 83 Stat. 487, 498–518 (1969), Congress enacted a series of provisions to remedy the perceived inadequacies of prior law in controlling certain charitable trusts exempt from taxation under section 501(c)(3) of the Code, known as "private foundations." [15] *See generally* H.R. Rep. No. 413, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad. News 1645; S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027; H.R.Rep. No. 782, 91st Cong., 1st Sess., *reprinted in* 1969 U.S. Code Cong. & Ad.News 2392. Although these provisions of the Code are specifically addressed to tax-exempt charitable organizations, section 4947(a)(1) extends the private foundation rules in their entirety to certain "exclusively charitable" trusts that are not exempt from taxation.[16] Section 4947(a)(2) extends portions of the private foundation rules to certain non-tax-exempt trusts that are not "exclusively charitable," known as "split-interest" trusts, created *after* May 27, 1969.[17] The purpose of section 4947, as reflected in its legislative history, is to enforce the private foundation

The Trustees have argued that any sale of *The Day* resulting from application of the private foundation rules would violate public policy disfavoring media concentration. Plaintiffs' Memorandum at 56–59. The court need not reach the question whether *The Day* better serves the New London community as an autonomous, local newspaper than it would if it were a unit of a national or regional publishing company. Weighing the relative merits of chain versus independent newspapers is both unnecessary and inappropriate in this case. Tr. 21–24. If newspaper consolidations in the early part of this century initiated by Joseph Pulitzer, E.W. Scripps and William Randolph Hearst, among others, *see generally* F. Mott, *American Journalism* 637–645 (3d ed. 1962), shed light on Bodenwein's intentions in setting up the Trust, they are of course relevant to the extent that Bodenwein's intentions are themselves relevant.

For an account of Joseph Pulitzer's analogous attempt to perpetuate one of his newspapers, *see In re Pulitzer's Estate*, 139 Misc. 575, 249 N.Y.S. 87 (1931) (Foley, S.), *aff'd without opinion*, 237 App.Div. 808, 260 N.Y.S. 975 (1932). In a codicil to his will, Pulitzer transferred a large majority of the shares of the Press Publishing Company, publisher of *The New York World, The Sunday World* and *The Evening World,* to a trust and charged the trustees, his three sons, with the duty of preserving, perfecting and perpetuating "The World" newspaper (to the maintenance and upbuilding of which I have sacrificed my health and strength) in the same spirit in which I have striven to create and conduct it as a public institution, from motives higher than mere gain, it having been my desire that it should be at all times conducted in a spirit of independence and with a view to inculcating high standards and public spirit among the people and their official representatives, and it is my earnest wish that said newspaper shall hereafter be conducted upon the same principles.

*Id.* at 578, 249 N.Y.S. at 92.

**15.** In general, section 501(c)(3) of the Code exempts from taxation certain entities that are "organized and operated exclusively for religious, charitable, scientific, ... literary, or educational purposes," no substantial part of which carries on propaganda and influences legislation and no part of which inures to the benefit of any private individual.

**16.** Section 4947(a)(1) provides, in pertinent part, as follows:

For purposes of part II of subchapter F of chapter 1 (other than section 508(a), (b) and (c)) and for purposes of this chapter, a trust which is not exempt from taxation under section 501(a), all of the unexpired interests in which are devoted to one or more of the purposes described in section 170(c)(2)(B), and for which a deduction was allowed under section 170, 545(b)(2), 556(b)(2), 642(c), 2055, 2106(a)(2), or 2522 (or the corresponding provisions of prior law), shall be treated as an organization described in section 501(c)(3).

**17.** Section 4947(a)(2) provides as follows:

In the case of a trust which is not exempt from tax under section 501(a), not all of the unexpired interests in which are devoted to one or more of the purposes described in section 170(c)(2)(B), and which has amounts in trust for which a deduction was allowed under section 170, 545(b)(2), 556(b)(2), 642(c), 2055, 2106(a)(2), or 2522, section 507 (relating to termination of private foundation status), section 508(e) (relating to governing instruments) to the extent applicable to a trust described in this paragraph, section 4941 (relating to taxes on self-dealing), section 4943 (relating to taxes on excess business holdings) except as provided in subsection (b)(3), section 4944 (relating to investments which jeopardize charitable purpose) except as provided in subsection (b)(3), and section 4945 (relating to taxes on taxable expenditures) shall

rules against charitable trusts that would be tax-exempt under section 501(c)(3) but for their intentional failure to apply for tax-exempt status in order to avoid application of the private foundation rules.[18]

Under section 4947(a)(1), "exclusively charitable" trusts are treated as section 501(c)(3) organizations for purposes of the private foundation rules although they have not been accorded tax-exempt status. To be an "exclusively charitable" trust under section 4947(a)(1), a trust must meet three requirements: (1) it must not be an exempt organization under section 501(a);[19] (2) all beneficial interests in the trust which have not yet expired under the terms of the trust instrument must be devoted to one or more of the purposes described in section 170(c)(2)(B);[20] and (3) a charitable deduction must have been allowed with respect to amounts transferred to the trust.

If a trust meets the first and third requirements, but all of the "unexpired inter-ests" in the trust are not devoted to charitable purposes described in section 170(c)(2)(B), the trust is classified as a "split-interest" trust. Split-interest trusts created prior to May 27, 1969 are not subject to any of the private foundation rules. I.R.C. § 4947(a)(2)(C). Split-interest trusts created after May 27, 1969 are subject to the taxes on self-dealing and taxable expenditures and, to a limited extent, the taxes on jeopardy investments and excess business holdings. I.R.C. § 4947(a)(2); *see* note 17, *supra.*

## IV.

The parties agree that the Trust is not exempt from taxation under section 501(a), section 501(c)(3), any other section of the Code or any corresponding provisions of prior law. Stip. ¶ 32; *see* Government's Memorandum at 7. Moreover, it is agreed for purposes of this action that Boden-

apply as if such trust were a private foundation. *This paragraph shall not apply with respect to—*

(A) any amounts payable under the terms of such trust to income beneficiaries, unless a deduction was allowed under section 170(f)(2)(B), 2055(e)(2)(B), or 2522(c)(2)(B),

(B) any amounts in trust other than amounts for which a deduction was allowed under section 170, 545(b)(2), 556(b)(2), 642(c), 2055, 2106(a)(2), or 2522, if such other amounts are segregated from amounts for which no deduction was allowable, or

(C) *any amounts transferred in trust before May 27, 1969.*
(Emphasis added).

**18.** The Senate Report states as follows:

If a nonexempt charitable trust were not subject to many of the requirements and restrictions imposed on private foundations, it would be possible for taxpayers to avoid these restrictions by the use of nonexempt trusts instead of private foundations.

S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2123. The Treasury Regulations similarly state that "[t]he basic purpose of section 4947 is to prevent these trusts from being used to avoid the requirements and restrictions applicable to private foundations." Treas.Reg. § 53.4947–1(a) (1976).

**19.** In general terms, section 501(a) exempts from taxation a variety of nonprofit "public service" and "mutual benefit" organizations. The principal types of tax-exempt "public service" organizations are:

1. Charitable organizations
2. Educational organizations
3. Scientific organizations
4. Social welfare organizations
5. Churches and other religious organizations
6. Political parties

The most significant of the "bewildering array" of tax-exempt "mutual benefit" organizations are:

1. Social clubs
2. Consumer cooperatives and similar organizations
3. Labor unions
4. Trade associations

Section 501 and other provisions of the Code governing nonprofit organizations are examined in detail in Bittker & Rahdert, *The Exemption of Nonprofit Organizations from Federal Income Tax*, 85 Yale L.J. 299 (1976).

**20.** Section 170(c)(2)(B) defines a charitable contribution as a gift to or for the use of "[a] corporation, trust, or community chest, fund, or foundation ... organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if not part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals."

wein's estate was allowed a charitable deduction for amounts transferred to the Trust. Stip. ¶ 33.[21] The private foundation rules are thus applicable to the Trust only if all of the unexpired interests in the Trust are devoted to charitable purposes.

The Trustees argue that all of the unexpired interests in the Trust are not devoted to the charitable purposes enumerated in section 170(c)(2)(B), and thus that the Trust is not an "exclusively charitable" trust under section 4947(a)(1), but rather is a split-interest trust under section 4947(a)(2). There are two principal thrusts to this argument. First, the Trustees maintain that *The Day*, a commercial enterprise, has an unexpired beneficial interest in the Trust. Second, they contend that the concededly unexpired interest of the Foundation in the Trust is devoted in part to "public purposes" enumerated in section 170(c)(1). The Trustees acknowledge that Treasury Regulation section 53.4947-1(a)[22] provides that "public purposes" specified in section 170(c)(1) are equivalent to "charitable purposes" under section 170(c)(2)(B) in determining whether a trust is "exclusively charitable" under section 4947. Plaintiffs' Memorandum at 44. The Trustees maintain, however, that equating section 170(c)(2)(B) "charitable purposes" with section 170(c)(1) "public purposes" in the regulation is an invalid attempt to broaden the scope of section 4947(a)(1). *Id.*

If the Trustees are correct in either respect, the Trust cannot be deemed "exclusively charitable," and must therefore be considered a split-interest trust created prior to May 27, 1969. As such, the Trust is subject to none of the private foundation rules, including the excise tax on net investment income directly at issue in this litigation, and may continue to function substantially as Bodenwein contemplated in the Will he executed in 1938. If the Trustees are mistaken with respect to both assertions, the Trust is governed by the private foundation rules, and would be required to divest itself of *The Day* in order to avoid the 200 percent tax on excess business holdings imposed by section 4943 of the Code.

## A. *The Purported Beneficial Interest of The Day in the Trust*

■ To determine whether the Trust is an exclusively charitable trust under section 4947(a)(1), or is instead a split-interest trust under 4947(a)(2), "[t]he inquiry is simply into the nature of the beneficiary or beneficiaries of the unexpired interests." *Peters v. United States*, 624 F.2d 1020, 1024 (Ct.Cl.1980).

Identifying the beneficiaries of a trust under governing state law is a matter of substance, not of form. *Schoellkopf v. Marine Trust Co.*, 267 N.Y. 358, 362, 196 N.E. 288, 290 (1935). The determination is to be "made from an examination of the language of the will as a whole, including the ascertainment of the testamentary plan, in light of the circumstances under which the will was executed." *Rosa v. Palmer*, 177 Conn. 10, 13, 411 A.2d 12, 14 (1979); *see, e.g., Gimbel v. Bernard and Alva Gimbel Foundation, Inc.*, 166 Conn. 21, 26, 347 A.2d 81, 84 (1974); *Hoops v. Stephan*, 131 Conn. 138, 143, 38 A.2d 588, 590 (1944).

■ Under general and well-established principles of trust law, a "beneficiary" is one who enjoys the advantages of the administration of the trust by the trustee. *Reinecke v. Smith*, 289 U.S. 172, 174–175, 53 S.Ct. 570, 571–572, 77 L.Ed. 1109 (1933); *Savage v. Commissioner*, 82 F.2d 92, 93–

---

**21.** Neither the IRS nor the Trustees can locate Bodenwein's estate tax return to determine whether any charitable deduction was claimed under the predecessor of section 2055 for amounts transferred to the Trust. For purposes of this action, however, the Trustees have stipulated that Bodenwein's estate was allowed a charitable deduction for amounts transferred to the Trust. Stip. ¶ 33.

**22.** Treasury Regulation section 53.4947-1(a) provides, in pertinent part, that "[f]or purposes of this section ..., the term 'purposes described in section 170(c)(2)(B)' shall be treated as including purposes described in section 170(c)(1)."

94 (3d Cir.1936); Restatement (Second) of Trusts § 3(4), at 12 (1959); 1 G. Bogert, *Trusts and Trustees* § 1, at 4 (rev. 2d ed. 1979). "Any right given by the trust instrument to receive a benefit from the trust in some contingency is a 'beneficial interest' in the trust." *Schoellkopf v. Marine Trust Co., supra,* 267 N.Y. at 362, 196 N.E. at 290; *see Blair v. Commissioner,* 300 U.S. 5, 12, 57 S.Ct. 330, 333, 81 L.Ed. 465 (1937).

The Government insists that *The Day*—which, as a practical matter, is indistinguishable from the Day Publishing Company—cannot have a beneficial interest in the Trust because a corporation cannot be the beneficiary of a trust whose corpus is stock of the corporation. Tr. 33. This proposition is by no means obvious, and the Government has not drawn to the court's attention any legal authority to support it.[23] There is, however, considerable authority for the general proposition that a corporation may be the beneficiary of a trust of property if the corporation has the capacity to take and hold legal title to such property. *Proprietors of the White School House v. Post,* 31 Conn. 240, 258 (1862); *Alcoma Corp. v. Ackerman,* 26 Misc.2d 678, 680, 207 N.Y.S.2d 137, 140 (1960); Restatement (Second) of Trusts, *supra,* § 116, comment c; 2 *Scott on Trusts* § 116, at 885 (3d ed. 1967); 2 G. Bogert, *supra,* § 161, at 126; L. Cleaveland, H.

Hewitt & C. Clark, *Probate Law and Practice in Connecticut* § 479, at 715 (1915). The Connecticut Stock Corporation Act explicitly provides that a corporation may acquire and hold its own shares. Conn.Gen. Stat. § 33–358. Moreover, it is clear that a corporation's stock may be held in trust for the corporation's benefit. *See* 2 *Scott on Trusts, supra,* § 117.1, at 886 n. 1. Finally, the provisions of the Code governing private foundations do not themselves purport to dictate permissible classes of trust beneficiaries.[24] In these circumstances, there is no justification, either in principles of trust law or the provisions of the Code, for the Government's position that the Day Publishing Company is incapable of being a beneficiary of the Trust. *Cf. Freed v. Judith Realty and Farm Products Corp.,* 201 Va. 791, 113 S.E.2d 850 (1960) (assuming without explanation that a corporation may be the beneficiary of a trust the sole asset of which is stock of the corporation).

The Government initially also argued that *The Day* is not a beneficiary of the Trust because the language in the Will concerning *The Day* merely reflects "Bodenwein's theories as to the best way to manage a newspaper ... to assure its long-term profitability." Government's Memorandum at 20. At oral argument, the Government either abandoned or modified this line of argument, and now maintains

---

**23.** The Court: I'm intrigued, if not puzzled, by the fact that you don't cite in your brief any caselaw at all to support your proposition on this issue. And I suppose it is arguable that it speaks for itself, or speaks rather loudly.

Mr. Mullarkey: Yes, I would say, your Honor, that it does.

I would say that the plaintiffs' position here is attempting to stand the statute on its head. It really extols as virtues that which Congress considered its vice. And I think it's quite true that nobody except in desperation would make such an argument.

So, consequently, ... there is really no case that I can think of that would even attempt to make that argument.

It is clear that the Trustees here realize that the perpetuation of their existence as power-brokers in [New London] may be eliminated and, consequently, they go to these extremes to make these arguments.

Tr. 35–36.

**24.** The Government maintains that *The Day* does not fit within the definition of "beneficiary" in section 643 of the Code. Section 643(c) defines the term "beneficiary" only as it appears in specifically mentioned provisions of the Code, not including section 4947. The same word used in different sections of the Code does not necessarily have the same meaning in all of them. *Sirbo Holdings, Inc. v. Commissioner,* 509 F.2d 1220, 1223 (2d Cir.1975) (Friendly, J.). Moreover, the listing of "heir, legatee, devisee" in section 643(c) is not exclusive; the section states only that "[f]or purposes of this part, the term 'beneficiary' *includes* heir, legatee, devisee" (emphasis added). *See* 3 B. Bittker, *supra,* ¶ 81.1.4, at 81.9. Section 7701(b) indicates that the term "includes," when used in a definition contained in the Code, does not "exclude other things otherwise within the meaning of the term defined."

that any intention of Theodore Bodenwein to perpetuate *The Day* is irrelevant.[25] This new contention is premised on an incorrect interpretation of the decision of the Court of Claims in *Peters v. United States, supra.*

In *Peters*, the settlor created several trusts funded with shares of the Allen-Bradley Company. The trust at issue in the case provided that upon the death of the primary life beneficiary, the trustees were to pay "so much of the trust's income as they deemed wise" to the Allen-Bradley Foundation, a private foundation. The trustees were directed to distribute the corpus of the trust to the Allen-Bradley Foundation thirty years after the death of the last of seven named individuals, five of whom were still living at the time the case was decided. 624 F.2d at 1021. In *Peters*, the trustees and the Allen-Bradley Foundation, the successor beneficiary, argued that the trust was not established for charitable purposes, but rather to hold Allen-Bradley Company shares and to distribute income generated by those shares to the stated beneficiaries. *Id.* at 1024. The Court of Claims held that the settlor's purported intention not to create a charitable trust was irrelevant and that the pertinent inquiry under section 4947(a)(1) is simply whether all of the unexpired interests in the trust are devoted to charitable purposes. *Id.*

In *Peters*, it was undisputed that the Allen-Bradley Foundation was the sole beneficiary of the trust following the death of the primary life beneficiary. Moreover, there was no claim that the Allen-Bradley Company itself had a beneficial interest in the trust. Thus, the court in *Peters* was not required to address procedures for identifying trust beneficiaries, and the case provides no support for the Government's argument that Bodenwein's intent is irrelevant to a determination of whether the *The Day* has a beneficial interest in the Trust.

The importance of *The Day* to Bodenwein is demonstrated by the prominent place it occupies in his Will; he mentioned it first before referring to his wife or children. *See* Exhibit A, Article First. The bulk of the Will is occupied with the statement of Bodenwein's goals for *The Day* and the means to achieve them after his death. In Article First of the Will, Bodenwein states that *The Day* "should be more than a business enterprise." Instead, the newspaper was to be "the champion and protector of the public interest and defender of the people's rights." The Trustees are expressly directed to expend funds liberally to accomplish Bodenwein's purposes; only net income "remaining" after making provision for *The Day* is to be distributed to the Foundation. Exhibit A, Article Fourth.

■ The Government contends that Bodenwein's sole purpose in structuring the bequests in the Will as he did was to maximize income of *The Day* for the ultimate benefit of his wife and children during their lifetimes and for the public and charitable beneficiaries of the Foundation. Government's Memorandum at 20. This argument is unpersuasive. Bodenwein could have attained the objective imputed to him by the Government in a simpler and more straightforward fashion by establishing a single testamentary trust; the trus-

---

**25.** The Court: Whatever it is that you say was the purpose of Bodenwein setting up the Trust and writing his Will in the way that he did, clearly it is a purpose or an intention markedly at variance with the purpose and intention ascribed to Bodenwein by your adversaries, right?

Mr. Mullarkey: Well, not necessarily, your Honor. I don't think it makes any difference.

The Court: It doesn't?

Mr. Mullarkey: No.

The Court: In other words, Bodenwein's purpose, what Bodenwein intended to do in setting up this Trust and in writing his Will you regard as irrelevant?

Mr. Mullarkey: Yes....

\*      \*      \*      \*      \*      \*

... I think it's quite probable that Mr. Bodenwein's purpose and intent was to make sure that his newspaper was run the way he thought a newspaper should be run. But it's just totally irrelevant what his intent was, as the court in *Peters* said.

Tr. 52–54.

tee of this single trust could have been directed to hold and manage its assets, including stock of the Day Publishing Company, for the maximum economic benefit of the beneficiaries. The Government's argument is further undermined by its failure to explain why Bodenwein would have created the complex two-trust arrangement if he did not intend to benefit two distinct sets of beneficiaries—*The Day,* on the one hand, and his family and beneficiaries of the Foundation on the other. *See Reaney v. Wall,* 134 Conn. 663, 667, 60 A.2d 505, 508 (1948), *quoting Cumming v. Pendleton,* 112 Conn. 569, 574, 153 A. 175, 177 (1931) (when interpreting a will, all of the provisions of the will must be considered and each provision "harmonized and given effect").

The parties dispute the implications of the termination provisions of the Will, which provide that if *The Day* ceases to be published in New London, Connecticut or if it fails in two successive years to generate sufficient income to permit the Trust to distribute $25,000 to the Foundation, the Trust terminates. *See* Exhibit A, Article Fourth. In those circumstances, the Trustees are instructed to sell the sole asset of the Trust—its stock in the Day Publishing Company—and to distribute any proceeds to the Foundation. The Trustees maintain that if the intended function of the Trust were simply to channel income to the Foundation, Bodenwein would not have required a complete sale of the stock of the Day Publishing Company and termination of the Trust should *The Day* cease to be published in New London. The Government, on the other hand, argues that the forced sale of the Day Publishing Company stock in the event that distributions to the Foundation fall below $25,000 in two successive years demonstrates that the Day Publishing Company exists to benefit the Trust, not *vice versa.*

If maximizing distributions to the Foundation was indeed Bodenwein's sole concern, as the Government contends, the continued publication of a newspaper in New London would be inconsequential, provided that the Day Publishing Company was otherwise profitable. Moreover, Bodenwein's recognition that *The Day* would have to be sold if it could not adequately support his wife and children during their lifetimes does not, as the Government suggests, demonstrate in any conclusive manner that the newspaper has no beneficial interest in the Trust. Bodenwein's wish to provide for his family and his desire to perpetuate his life's work need not have been mutually exclusive.[26]

Considering the Will as a whole and the circumstances surrounding its execution, the court concludes that Bodenwein intended *The Day* to be a beneficiary of the Trust. In order for the Trust to be classified as a private foundation, section 4947(a)(1) requires that all unexpired interests in the Trust be devoted to charitable purposes. Because the newspaper, a commercial enterprise, has a beneficial interest in the Trust, the Trust has both charitable and non-charitable beneficiaries and must be classified as a split-interest trust under section 4947(a)(2). As the Trust was created prior to May 27, 1969, it is covered by the grandfather clause of section 4947(a)(2) exempting it from all of the private foundation rules, including the excise tax on net investment income imposed by section 4940.

---

**26.** Bodenwein's choice of Trustees also supports the argument that the Trust was created to fulfill his desires for *The Day.* Of the five Trustees, two must be exclusively employed in publishing *The Day,* whereas only one trustee represents the interests of the Foundation. In virtually all cases, the Trustees have sat on the Board of Directors of the Day Publishing Company while serving as Trustees. Exhibit A, Article Fourth. At present, the Trustees are comprised of the co-publishers of *The Day,* the chairman of the Journalism Department at the University of Connecticut, the former president of Connecticut College and a local businessman, nominee of the Connecticut National Bank, the Foundation trustee. Stip. ¶ 9. Had generation of income for distribution to the Foundation been paramount, it is unclear why Bodenwein would have vested effective control of the Trust in persons with a marked bias in favor of the newspaper. Tr. 47–49.

The court's conclusion that *The Day* is a beneficiary of the Trust is a sufficient basis for summary judgment in favor of the Trustees. If Treasury Regulation section 53.4947–1(a) is invalid as applied by the IRS in the circumstances presented by this case, as the Trustees contend, that invalidity would constitute a separate and independent basis for summary judgment in favor of the Trustees.

### B. The Validity of Treasury Regulation Section 53.4947–1(a)

■ Section 4947(a)(1) makes the private foundation rules applicable to a trust "all of the unexpired interests in which are devoted to one or more of the *purposes described in section 170(c)(2)(B)*" (emphasis added). The Foundation, which the parties agree has an unexpired interest in the Trust, *see* Stip. ¶¶ 24–26, is devoted in part to purposes set forth in Article Fifth of the Will, as follows:

> Payments may be made to the Town or City of New London, the Town of Groton, the Town of Waterford, or any town contiguous to any of the same, or any town or city in the State of Connecticut in which any newspaper published by the Day Trustees has a substantial circulation, providing said payment is made for a purpose exclusively public; or said

Trustee may expend said sum for any exclusively public purpose in respect to any of said towns or cities ....

The purposes listed above are not "charitable purposes" described in section 170(c)(2)(B); [27] rather, they are "public purposes" described in section 170(c)(1).[28] The Trustees contend that because the Foundation is devoted in part to "public purposes" described in section 170(c)(1), the Trust is outside the purview of section 4947(a)(1). In opposing this contention, the Government relies on Treasury Regulation section 53.4947–1(a), which states that "for purposes of [section 4947] the term 'purposes described in section 170(c)(2)(B)' shall be treated as including purposes described in section 170(c)(1)." [29] The Government concedes that Treasury Regulation section 53.-4947–1(a) "broadens" the statute it is intended to implement, Government's Memorandum at 23, but nevertheless maintains that it is a valid exercise of the Secretary's authority to promulgate regulations under section 4947. *See* Tr. 39–43.

The rulemaking authority of the Secretary stems from the general authorization contained in section 7805 and from section 4947(b)(1), which provides that the "Secretary shall prescribe such regulations as may be necessary to carry out the purposes" of section 4947. The Government

27. *See* note 20, *supra,* and accompanying text.

28. A contribution for public purposes is defined under section 170(c)(1) as a gift to or for the use of "[a] State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes." *Cf.* note 20, *supra* (defining gifts for "charitable," as opposed to "public," purposes).

29. The Government maintains that "gifts to political subdivisions for public purposes were considered gifts for charitable uses at common law and are still considered so today." Letter from D. Patrick Mullarkey to Judge José A. Cabranes (dated July 5, 1983) at 2, *citing* 6 B. Bogert, *supra,* § 369. If public purposes under section 170(c)(1) were indeed equivalent to charitable purposes under section 170(c)(2)(B), then Treasury Regulation section 53.4947–1(a) would be unobjectionable. However, "public purposes" is a broader concept than "charitable purposes." *Continental Illinois National Bank*

*and Trust Co. v. United States,* 403 F.2d 721, 724 (Ct.Cl.1968), *cert. denied,* 394 U.S. 973, 89 S.Ct. 1456, 22 L.Ed.2d 752 (1969) ("use of the word 'public' shows a congressional intention to bring within the statutory exemption gifts which could be used for such standard governmental functions as the payment of salaries to policemen and firemen"). The IRS itself has recognized that the term "public purposes" "encompasses gifts to domestic governmental subdivisions for purposes other than the ordinary philanthropic purposes usually associated with 'charity' and includes activities that the local government establishes to satisfy the needs of its public." Rev. Ruling 79–159, 1979–1 C.B. 309; *see also* Rev. Ruling 74–523, 1974–2 C.B. 304 (charitable deduction under I.R.C. § 2055(a) disallowed "with respect to a bequest of property to a foreign government or political subdivision thereof where the use of such property is not limited to exclusively charitable purposes").

argues that Treasury Regulation section 53.4947–1(a) is necessary to effectuate the purposes of section 4947 because absent the regulation it would be relatively simple to avoid the private foundation rules by creating a small interest devoted to section 170(c)(1) "public purposes" in an otherwise charitable trust. With an unexpired interest, however small, devoted to section 170(c)(1) "public purposes," section 4947(a)(1) would not apply and such a trust would be permitted to retain excess business holdings indefinitely, while benefitting from charitable deductions for distributions to beneficiaries. Government's Memorandum at 23.

The Government relies on two recent decisions of the Supreme Court to support its contention that the Secretary is empowered to "broaden" a statutory provision in the course of prescribing regulations to carry out its purposes: *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979), and *Commissioner v. Portland Cement Co.*, 450 U.S. 156, 101 S.Ct. 1037, 67 L.Ed.2d 140 (1981). Neither case is controlling on the facts presented here.

In *National Muffler Dealers Association, supra,* the regulation in question defined a term that had "no well-defined meaning or common usage outside the parameters of [the statute]." 440 U.S. at 476, 99 S.Ct. at 1306. The Court found the term "so general ... as to render an interpretive regulation appropriate." *Id., quoting Helvering v. Reynolds Co.*, 306 U.S. 110, 114, 59 S.Ct. 423, 425, 83 L.Ed. 536 (1939); *see* K. Davis, *Administrative Law Treatise* § 7:14 (Supp.1982). The Court also concluded that the legislative history of the Code section to which the regulation related provided strong support for the Secretary's interpretation. 440 U.S. at 477–479, 99 S.Ct. at 1307–1308. Section 4947(a)(1), unlike the Code section at issue in *National Muffler Dealers Association,* is explicit. It specifically refers to the "purposes described in section 170(c)(2)(B)." Furthermore, the Government has not brought to the court's attention anything in the legislative history of

section 4947(a)(1) which lends support to the position of the IRS.

*Portland Cement Co., supra,* 450 U.S. at 169, 101 S.Ct. at 1045, reiterates the general principle that courts should ordinarily defer to Treasury Regulations. Where "Congress has specifically given [the Secretary] authority to prescribe regulations necessary to carry out the statute's purpose, [such] regulations are entitled to a heavy presumption of validity." *United Telecommunications, Inc. v. Commissioner*, 65 T.C. 278, 281 (1975), *aff'd*, 589 F.2d 1383, 1387 (10th Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2839, 61 L.Ed.2d 284 (1979). Congress authorized the Secretary in section 4947(b)(1) to "promulgate such regulations as may be necessary to carry out the purposes" of section 4947. It is well-established, however, that Treasury Regulations cannot be sustained if they are plainly inconsistent with the Code, much less the particular Code provision which the regulations were intended to implement. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 533 n. 11, 99 S.Ct. 773, 781 n. 11, 58 L.Ed.2d 785 (1979); *United States v. Cartwright*, 411 U.S. 546, 557, 93 S.Ct. 1713, 1719, 36 L.Ed.2d 528 (1973); *Bingler v. Johnson*, 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969), *quoting Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed.2d 831 (1948); *Solomon v. Commissioner*, 570 F.2d 28, 32 n. 4 (2d Cir.1977); *Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1045 (Ct.Cl.1978).

In *Portland Cement Co.*, there was no claim that the challenged regulations were inconsistent with the Code, which provided that a depletion deduction would be allowed "in all cases to be made under regulations prescribed by the Secretary." 450 U.S. at 170, 101 S.Ct. at 1046. The Court accorded special deference to the Secretary's regulations on depletion allowances because Congress had recognized the "necessity of a 'broad rule-making delegation' of authority in the area of depletion." *Id.* at 169, 101 S.Ct. at 1045. There is no comparably broad delegation of rulemaking authority

in section 4947(b)(1) to validate the Secretary's determination that Congress intended to include "purposes described in section 170(c)(1)" when it used the phrase "purposes described in section 170(c)(2)(B)."

Section 4947(a) unambiguously states that only trusts with *all* unexpired interests "devoted to one or more of the purposes described in section 170(c)(2)(B)" will be treated as private foundations. There are five other explicit references to section 170(c)(2)(B) in the private foundation rules, yet there is no mention of section 170(c)(1) accompanying any of these references. *See* I.R.C. §§ 4942(g), 4945(d)(5).[30] These recurrent isolate references to section 170(c)(2)(B) refute the Government's contention that a mere "over[sight]" by Congress, Tr. 40–42, accounts for the failure to include trusts devoted to "public purposes" within the coverage of the private foundation rules.[31]

█ Congress plainly could have extended section 4947(a)(1) to encompass trusts created for the "public purposes" described in section 170(c)(1), but did not do so expressly. The IRS is not at liberty to "broaden" the scope of a Code provision[32]—in other words, to exercise the legislative function entrusted to Congress—by the promulgation of regulations. The attempt to equate "public purposes" with "charitable purposes" in Treasury Regulation section 53.4947–1(a) must fail because, to put the matter simply, it is at odds with the plain language of section 4947(a)(1).[33]

█ "[T]he statute always remains the primary authority and to the extent [the Commissioner] legislates, thereby exceeding his authority to interpret the statute, his promulgation is void." *United Telecommunications, Inc., supra,* 65 T.C. at 281; *Koshland v. Helvering,* 298 U.S. 441, 447, 56 S.Ct. 767, 770, 80 L.Ed. 1268 (1936) ("where ... the provisions of the act are unambiguous, and its · directions specific, there is no power to amend it by regulation"). Even if Congress created a gap in the statutory framework by referring in section 4947(a)(1) only to "public purposes" described in section 170(c)(2)(B), "[t]he Commissioner has no more power to add to the Act what he thinks Congress may have overlooked than he has to supply what Congress has deliberately omitted," *General Electric Co. v. Burton,* 372 F.2d 108, 111 (6th Cir.1967), *quoting Arkansas-Oklahoma Gas Co. v. Commissioner,* 201 F.2d 98, 102 (8th Cir.1953); *see* 1 J. Mertens, *Law of Federal Income Taxation* § 3.21 (rev. ed. 1981) ("[t]he Treasury may not ... restrict or enlarge the scope of a statute [nor] supply a supposed omission" in the

---

**30.** Like Treasury Regulation section 53.4947–1(a), the regulations under section 4942(g) provide that the phrase "purposes described in section 170(c)(2)(B)" includes purposes described in section 170(c)(1). *See* Treas.Reg. § 53.-4942(a)–3(a)(2) (1973). Inexplicably, the regulations under section 4945(d)(5) contain no such provision. *See* Treas.Reg. § 53.4945–6(a) (1972).

**31.** The explicit reference to section 170(c)(1) in section 4945(f)(4) of the private foundation rules further undermines the Government's contention that Congress failed to appreciate the distinction between "public purposes" in section 170(c)(1) and "charitable purposes" in section 170(c)(2)(B).

In any event, "inadvertences" and "oversights" should not lightly be imputed to a legislature whose committees on taxation are as well-staffed and expert as the Senate Committee on Finance and the House Committee on Ways and Means, and whose actions regarding revenue statutes are monitored with such exquisite care by diverse constituencies.

**32.** *See* Government's Memorandum at 23; Tr. 39–43.

**33.** A commentator has reached the same conclusion:

[Treasury Regulation section 53.4947–1(a)] would seem to be an unwarranted extension of the statute since the specific reference to section 170(c)(2)(B) would indicate a clear legislative intent not to extend the provisions of section 4947(a)(1) to trusts [with interests devoted to] the purposes described in other paragraphs of section 170(c) even though a deduction may have been allowed under such other paragraphs or comparable paragraphs of the estate and gift tax charitable deduction provisions.

Appert, *Nonexempt Charitable Trusts under the Tax Reform Act of 1969,* 25 Tax Law. 99, 110–111 (1971).

process of promulgating regulations). *But see* Tr. 39–43 (Government counsel concedes at oral argument that Congress "overlooked" nonexempt trusts devoted to section 170(c)(1) public purposes in drafting section 4947(a)(1), but nonetheless maintains that Commissioner is authorized to fill such "legislative gaps" by rulemaking).

Absent Treasury Regulation section 53.-4947–1(a), the Trust cannot be deemed "exclusively charitable" because the Foundation, a beneficiary of the Trust, is in part devoted to "public purposes." The Trust is therefore not a private foundation under section 4947(a)(1) and its net investment income is not taxable under section 4940 of the Code. Accordingly, summary judgment for the Trustees is appropriate on this ground as well.

### V.

The court's decision in favor of the Trustees will in no way free the Day Publishing Company from taxation; it will continue to pay normal corporate income taxes.[34] The Government's assertion that *the Trust* will be effectively exempt from taxation as a consequence of a decision adverse to the IRS's position, *see* Government's Memorandum at 20, is correct, but of no consequence. Any complex trust which currently distributes all of its net income to beneficiaries is, with certain qualifications, entitled to deduct those distributions under section 661 of the Code and is therefore, as a practical matter, immunized from taxation.[35]

Moreover, the uniqueness of Bodenwein's two-trust arrangement ensures that this court's decision—that the Trust does not meet the requirements of section 4947(a)(1)—will not have a significant impact on enforcement of the private foundation rules. Tax planning on the basis of this decision is not possible with respect to transfers in trust before May 27, 1969; whether or not such trusts are "split-interest" trusts will be determined by the nature of their beneficiaries under the terms of trust arrangements existing before that time. Nor is there any incentive for newly-created trusts to mimic the arrangement employed by Bodenwein in 1938, long before rules governing private foundations had been contemplated. Trusts created in the future cannot avoid the private foundation rules because the grandfather clause of section 4947(a)(2) applies only to amounts transferred in trust before May 27, 1969. *See* I.R.C. § 4947(a)(2)(C).

### Conclusion

For the reasons stated above, plaintiffs' motion for summary judgment is hereby granted in all respects, and defendant's cross-motion for summary judgment is hereby denied.

It is so ordered.

---

**34.** The Day Publishing Company paid federal income taxes of $381,503 in 1978, $466,837 in 1979, $229,403 in 1980, $112,069 in 1981 and $200,427 in 1982. Stip. ¶ 21.

**35.** *See* 3 B. Bittker, *supra,* ¶ 81.4 ("[t]he prevailing conduit theory of trust and estate income taxation allows the fiduciary to deduct, and requires the beneficiaries to report, distributed income").