E. Wesley HAMMOND, Charles E. Shain, Deane C. Avery, Evan Hill and Walter Baker, Trustees of the Day Trust, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 475, Docket 84–6222.

United States Court of Appeals, Second Circuit.

Argued Nov. 30, 1984.

Decided June 5, 1985.

Mark R. Kravitz, New Haven, Conn. (Stacey Jackson Perkins, Wiggin & Dana, New Haven, Conn., on the brief), for plaintiffs-appellees.

Robert S. Pomerance, Tax Div., Dept. of Justice, Washington, D.C. (Glen L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Ann Belanger Durney, Tax Div., Dept. of Justice, Washington, D.C., Alan H. Nevas, U.S. Atty. for Dist. of Conn., New Haven, Conn., on the brief), for defendant-appellant.

Before VAN GRAAFEILAND, KEARSE and PIERCE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant United States of America appeals from a final judgment of the United States District Court for the District of Connecticut, Jose A. Cabranes, *Judge*, awarding plaintiffs, the trustees ("Trustees" or "Day Trustees") of the Day Trust (the "Trust"), a refund of $2,801 in excise taxes paid by the Trust pursuant to § 4940 of the Internal Revenue Code of 1954, as amended ("IRC"), 26 U.S.C. § 4940 (1982), on its investment income for 1980. The district court, in an opinion reported at 584 F.Supp. 163 (1984), held that, under IRC § 4947(a)(2), 26 U.S.C. § 4947(a)(2) (1982), the Trust was not subject to the tax imposed by § 4940 because two entities having unexpired interests in the Trust were devoted to purposes not described in IRC § 170(c)(2)(B), 26 U.S.C. § 170(c)(2)(B) (1976). On appeal, the government contends that the district court erred because (1) one of the entities in question, the Day Company (the "Company"), had no unexpired interest in the Trust, and (2) the fact that the other entity, the Bodenwein Public Benevolent Foundation (the "Foundation"), which had income and remainder interests in the Trust, had the authority to make distributions to municipalities for public purposes—purposes described in IRC § 170(c)(1), 26 U.S.C. § 170(c)(1) (1976)—does not make its interest in the Trust an interest other than one "devoted to one or more of the purposes described in section 170(c)(2)(B)," IRC § 4947(a)(2). Because we conclude that the Company has an unexpired interest in the Trust, we affirm on that basis.

## I. BACKGROUND

This appeal presents the question whether, for the tax year 1980, the Trust was a charitable trust under IRC § 4947(a)(1), 26 U.S.C. § 4947(a)(1) (1982), or a split-interest trust under IRC § 4947(a)(2). If it was the former, it is treated as an organization described in IRC § 501(c)(3), 26 U.S.C. § 501(c)(3) (1982), and, accordingly, as a private foundation within the meaning of IRC § 509, 26 U.S.C. § 509 (1982), and is therefore subject to virtually the full panoply of rules and taxes imposed by IRC §§ 507–509 and 4940–4947, 26 U.S.C. §§ 507–509, 4940–4941, and 4943–4947 (1982) and 26 U.S.C. § 4942 (1976 & Supp. IV 1980) (the "private-foundation rules"). If it was instead a split-interest trust, it is not treated as a § 501(c)(3) organization or a private foundation and was not subject to the excise tax imposed by IRC § 4940. The basic facts are not in dispute.

### A. *The Trust and the Foundation*

For nearly fifty years prior to his death in 1939, Theodore Bodenwein was the owner, manager, and primary force behind *The New London Day ("The Day")*, a successful and highly acclaimed local newspaper published by the Company in New London, Connecticut. In the stated hope of perpetuating the local control, editorial independence, and high quality of *The Day*, Bodenwein established the Trust in his will (the "Will"); he bequeathed to the Trust his ownership interest in the Company, comprising virtually all of the Company's outstanding stock, and directed that the Trustees operate *The Day*. The Will also established the Foundation, which was to receive distributions from the Trust and make distributions to Bodenwein's wife and children

and to charitable and public entities in the New London area. The parties have stipulated, in effect, that Bodenwein's estate received a charitable deduction under IRC § 2055, 26 U.S.C. § 2055 (1982), or its predecessor for the bequest to the Trust.

Pursuant to Article 4 of the Will, the Trust has been administered by a self-perpetuating board of five Trustees, two of whom must be employed exclusively in publishing *The Day*. The Will directed the Trustees

[t]o hold said stock; to manage and operate by means thereof a newspaper to be published in New London, Connecticut, hereinafter referred to as "The Day" ...: to so manage said newspaper ... as to provide liberal compensation and various forms of assistance and rewards, such as insurance, bonuses, and pensions, to its employees; to pay sufficient salaries to assure a high type of executives and skilled writers and workmen; to make provision for providing in the course of time a new building to house the paper and such other tenants as they consider it desirable to provide space for, such building to be distinctive in character, a credit to the City architecturally, and an evidence of a farsighted policy; to constantly improve and maintain the mechanical plant used for publishing the paper; to maintain reasonable reserves for all of the above and for unforeseen contingencies, including taxes; said provisions as to compensation, assistance, and rewards to employees, salaries to executives, the erection of a building, and the maintenance of reserves are to be in every respect at the discretion of said trustees, and said trustees to be mindful always, in making such expenditures or reserves therefor, of my desire that the Foundation receive sufficient funds to pay the sums hereinafter provided for my wife and children: to annually determine the net income from said business over and above all expenditures and reserves: to pay out of said net income all taxes and expenses in connection with the trust, and pay all remaining net income to The National Bank of Commerce, as Trustee, as hereinafter set forth, of The Bodenwein Public Benevolent Foundation.

The Trustees are also authorized, in the event that substantial tax savings would result, to liquidate the Company and hold its assets directly in the Trust. Further, if the Company ceases to publish a newspaper in New London, or if, in each of two successive years, the Trust fails to distribute at least $25,000 to the Foundation, the Trustees are to sell the Company, terminate the Trust, and distribute the proceeds to the Foundation.

Under Article 5 of the Will, the Foundation was to use its distributions from the Trust to pay taxes and administration expenses, and to distribute 90% of the remaining income to Bodenwein's wife and children, so long as any of them survived, and 10% to "uses" selected by the trustee of the Foundation (the "Foundation Trustee"). The Foundation Trustee's choice of uses was limited as follows:

(a) Payments may be made to the Town or City of New London, the Town of Groton, the Town of Waterford, or any town contiguous to any of the same, or any town or city in the State of Connecticut in which any newspaper published by the Day Trustees has a substantial circulation, providing said payment is made for a purpose exclusively public; or said [Foundation] Trustee may expend said sum for any exclusively public purpose in respect to any of said towns or cities:

(b) Payments may be made to any corporation organized under the laws of the State of Connecticut, providing said corporation is engaged solely in religious, charitable, scientific, or educational purposes, and providing that the sums so paid are restricted to the use exclusively for one or more of such purposes within one or more of the towns or cities above described; or said [Foundation T]rustees may expend any sum for such purposes. No such trustee or corporation shall be engaged in carrying on propaganda or influencing legislation, nor shall the

earnings of any such corporation inure to the benefit of any stockholder or individual. . . .

Since the creation of the Trust in 1939, the Day Trustees have participated actively in managing the affairs of the Company. The Will named as original Trustees the then-directors of the Company, and, with a single exception, all of the subsequent Trustees have been directors of the Company during their terms as Trustees. The Trustees' monthly meetings have been devoted primarily to matters of Company management, such as personnel decisions, capital expenditures, editorial policies, circulation, and competition from other local newspapers. The Trustees have caused the Company to approve liberal compensation for the Company's employees, to expand its plant, to improve its mechanical equipment, and to maintain substantial reserves in the Company.

B. *The Administrative and Judicial Proceedings*

In 1978, the last survivor among Bodenwein's wife and children died. Thereafter, under Article 5 of the Will, all of the income and principal of the Foundation became payable for public or charitable purposes selected by the Foundation Trustee. Accordingly, in 1979, the Foundation Trustee applied for, and received from the Internal Revenue Service ("IRS"), recognition that the Foundation was a tax-exempt charitable organization described in § 501(c)(3) and a private foundation under § 509.

In 1979, the Day Trustees applied to the IRS for a determination of the Trust's status under IRC § 4947(a). That section provides, in pertinent part, as follows:

(a) *Application of tax*

(1) *Charitable trusts*

. . . [F]or purposes of this chapter, a trust which is not exempt from taxation under section 501(a), all of the unexpired interests in which are devoted to one or more of the purposes described in section 170(c)(2)(B), and for which a deduction was allowed under section . . . 2055 . . . (or the corresponding provisions of prior

law), shall be treated as an organization described in section 501(c)(3). . . .

(2) *Split-interest trusts*

In the case of a trust which is not exempt from tax under section 501(a), *not* all of the unexpired interests in which are devoted to one or more of the purposes described in section 170(c)(2)(B), and which has amounts in trust for which a deduction was allowed under section . . . 2055 . . ., section 4941 (relating to taxes on self-dealing), section 4943 (relating to taxes on excess business holdings) . . ., section 4944 (relating to investments which jeopardize charitable purpose) . . ., and section 4945 (relating to taxes on taxable expenditures) shall apply as if such trust were a private foundation. This paragraph shall not apply with respect to—

. . . . .

(C) any amounts transferred in trust before May 27, 1969.

(Emphasis added.) Section 170(c), 26 U.S.C. § 170(c) (1976), defines charitable contributions, in pertinent part, as follows:

(c) *Charitable contribution defined*

For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

(2) A corporation, trust, or community chest, fund, or foundation—

\* \* \* \* \* \*

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals; . . . .

The Trustees contended that the Trust was not a charitable trust under

§ 4947(a)(1) but was a split-interest trust within the meaning of § 4947(a)(2) for two reasons: (1) because the Company had an unexpired interest in the Trust, and its interests were devoted to commercial, not § 170(c)(2)(B), purposes; and (2) because the Foundation, which had income and remainder interests in the Trust, was authorized to make distributions not only for the "religious, charitable, scientific, literary, or educational purposes" described in § 170(c)(2)(B), but also for the "exclusively public purposes" described in § 170(c)(1), and therefore the Foundation's interest in the Trust was not one "devoted to one or more of the purposes described in section 170(c)(2)(B)." As part of its second contention, the Trustees argued that Treas.Reg. § 53.4947–1(a), 26 C.F.R. § 53.4947–1(a) (1984), which provides, *inter alia*, that "for purposes of [§ 4947], the term 'purposes described in section 170(c)(2)(B)' shall be treated as including purposes described in section 170(c)(1)," is contrary to the unambiguous language of § 4947(a)(1) and is therefore invalid.

In 1981, the IRS rejected all of the Trustees' contentions and ruled that the Trust was "exclusively charitable" and was therefore, under §§ 501(c)(3), 509, and 4947(a)(1), subject to the private-foundation rules. Without conceding the correctness of the IRS's ruling, the Trust filed its 1980 tax return as an exclusively charitable trust, paid the $2,801 in excise taxes imposed on its net investment income by § 4940, and applied for a refund. When the IRS had taken no action on the refund claim for more than six months, the Trustees filed the present action, renewing the contentions made to the IRS in 1979.

In a decision reported at 584 F.Supp. 163, the district court agreed with both of the Trustees' contentions as to why the Trust was a split-interest trust and not a charitable trust. The court held that "[t]o determine whether the Trust is an exclusively charitable trust under section 4947(a)(1), or is instead a split-interest trust under 4947(a)(2), '[t]he inquiry is simply into the nature of the beneficiary or beneficiaries of the unexpired interests,'" 584 F.Supp. at 172 (quoting *Peters v. United States*, 224 Ct.Cl. 222, 624 F.2d 1020, 1024 (Ct.Cl. 1980)), and held that a beneficiary of a trust is simply "one who enjoys the advantages of the administration of the trust," 584 F.Supp. at 172. The court found that Bodenwein's central purpose in creating the Trust as part of a two-trust scheme was to constitute it a body devoted to the perpetuation of *The Day* and that, under the Will, the Trustees were authorized (1) to withhold net income of the Company from distribution to the Trust and to the Foundation, (2) to establish reserves for the benefit of the Company both in the Company and in the Trust, (3) to operate and manage the Company so as to ensure *The Day*'s continuation as a locally controlled, high-quality, independent newspaper even if that were not the most profitable course for the Foundation, and (4) to make distributions of Trust principal or income to the Company. The court ruled, therefore, that the Company was a beneficiary of the Trust. Since the Company was a commercial entity, its status as a beneficiary made the Trust a split-interest, not an exclusively charitable, trust.

The court also held that the interest of the Foundation was not one devoted exclusively to "the purposes described in section 170(c)(2)(B)" because the Foundation was authorized to make distributions to municipalities for "public purposes." The court ruled that to the extent that Treas.Reg. § 53.4947–1(a) provided that § 4947(a)(1) reached the purposes described in § 170(c)(1) and not just the purposes described in § 170(c)(2)(B), as unambiguously specified by Congress, the regulation was invalid.

Judgment was entered granting the Trustees a refund of the tax paid under § 4940. This appeal followed.

## II. DISCUSSION

On appeal, the government challenges both of the district court's bases for concluding that the Trust was a split-interest trust. Since we agree with the district

court that the Trust was a split-interest trust because of the unexpired interest of the Company, the questions as to the nature of the Foundation's interest and the validity of Treas.Reg. § 53.4947–1(a) are moot and we do not reach them.

The government attacks the conclusion that the Company had an interest in the Trust that prevented the Trust from being a strictly charitable trust on precedential, factual, theoretical, and policy grounds. Although some of the questions are close, we reject the government's contentions. We begin by exploring the background and details of the regulatory scheme.

### A. The Statutory Scheme

■ Enacted as part of the Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487, the private-foundation rules, IRC §§ 507–509, 4940–4947, were intended by Congress to prevent abuses by certain privately-controlled charitable entities, called private foundations, of their tax-exempt status. See S.Rep. No. 552, 91st Cong., 1st Sess. 6, 25–62 (1969) (hereinafter *"Senate Report"*), *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2032, 2052–90; H.R.Rep. No. 413 (pt. 1), 91st Cong., 1st Sess. 4, 19–43 (1969) (hereinafter *"House Report Part I"*), *reprinted in* 1969 U.S.Code Cong. & Ad.News 1645, 1648, 1663–89; H.R.Rep. No. 413 (pt. 2), 91st Cong., 1st Sess. 2–21 (1969) (hereinafter *"House Report Part II"*). The generic abuse that Congress sought to address by these rules was private foundations' using for noncharitable purposes assets donated by contributors who had received charitable deductions for those donations. In particular, Congress found that such assets were frequently used by private foundations to accumulate income, to perpetuate and operate family businesses with the competitive advantages of tax exemptions, to invest in overly risky ventures, to engage in self-dealing transactions with substantial contributors or foundation managers, or to promote political or other noncharitable objectives. The private-foundation rules were designed to put an end to each of these practices. See Senate Report 6, *reprinted in* 1969 U.S. Code Cong. & Ad.News 2027, 2032; *House Report Part I* 4, *reprinted in* 1969 U.S. Code Cong. & Ad.News 1645, 1648.

A private foundation is defined, with certain exceptions, as an "organization described in section 501(c)(3)." IRC § 509(a). Section 501(c)(3) describes organizations "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition ..., or for the prevention of cruelty to children or animals." In order to prevent the abuses identified by Congress, §§ 4941–4945 impose a series of taxes both on the private foundations that engage in them and on their managers. A relatively modest tax is imposed initially for each abuse found; if the abuse is not corrected, the more onerous taxes outlined below also are imposed.

To prevent self-dealing with foundations by substantial contributors and foundation managers, § 4941(b) imposes on an individual or entity that engages in such a transaction with a private foundation a tax of 200% of the amount involved in the transaction. See Senate Report 28–34, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2055–61; *House Report Part I* 20–24, *reprinted in* 1969 U.S.Code Cong. & Ad. News 1645, 1664–69.

To prevent undue accumulation of income by foundations, § 4942(b) imposes on the foundation a tax of 100% of the amount by which the foundation's total annual distributions for charitable purposes fall short of the foundation's adjusted net income or 5% of the foundation's net assets, whichever is greater. See H.R.Rep. No. 782, 91st Cong., 1st Sess. 281–82 (1969) (hereinafter *"Conference Report"*), *reprinted in* 1969 U.S.Code Cong. & Ad.News 2392, 2395–96; *Senate Report* 34–38, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2061–65; *House Report Part I* 25–27, *reprinted in* 1969 U.S.Code Cong. & Ad. News 1645, 1669–71; *see also* Economic Recovery Tax Act of 1981, Pub.L. No. 97–

34, § 823, 95 Stat. 172, 351–52 (repealing adjusted-net-income branch of minimum-distribution requirement for tax years after 1981).

To prevent the use of foundations to perpetuate family businesses to the competitive disadvantage of businesses operated on a fully taxable basis and to prevent the compromise of the foundation's charitable purposes for the benefit of such businesses, § 4943(b) imposes on private foundations a tax of 200% of the value of so much of the foundation's holdings of voting stock in a business enterprise as exceeds 20% of the enterprise's total voting stock. *See Senate Report* 38–45, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2066–72; *House Report Part I* 27–31, *reprinted in* 1969 U.S.Code Cong. & Ad. News 1645, 1671–75.

To prevent the investment of foundation assets in high-risk ventures that jeopardize the carrying out of the foundation's charitable purposes, § 4944(b) imposes on the foundation a tax of 25% of the value of the foundation's assets invested in such ventures. *See Conference Report* 283–84, *reprinted in* 1969 U.S.Code Cong. & Ad. News 2392, 2397–98; *Senate Report* 45–46, *reprinted in* 1969 U.S.Code Cong. & Ad. News 2027, 2072–74; *House Report Part I* 31, *reprinted in* 1969 U.S.Code Cong. & Ad.News 1645, 1675–76.

To prevent the spending of foundation assets for political and other noncharitable purposes, § 4945(b) imposes on the foundation a tax of 100% of the value of such expenditures. *See Senate Report* 46–51, *reprinted in* 1969 U.S.Code Cong. & Ad. News 2027, 2074–79; *House Report Part I* 31–35, *reprinted in* 1969 U.S.Code Cong. & Ad.News 1645, 1676–80.

Finally, in order to defray the cost of policing these rules, § 4940 imposes a tax on foundations of 2% of their annual net investment income. *See Conference Report* 278, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2392, 2392; *Senate Report* 27–28, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2053–54; *see also* Revenue Act of 1978, Pub.L. No. 95–600,

§ 520, 92 Stat. 2763, 2884 (reducing tax from 4% to 2%).

Though the private-foundation rules are primarily aimed at regulating the activities of § 501(c)(3) entities exempt from taxation under § 501(a), Congress was concerned that taxpayers would seek to escape the effect of those rules by organizing charitable entities as trusts and avoiding § 501(c)(3) status, and hence private-foundation status, by simply failing to apply for a § 501(a) exemption, while still enjoying effective tax exemption by virtue of the conduit treatment generally accorded to trusts. *See Senate Report* 93–94, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2123–24; Treas.Reg. § 53.4947–1(a); *see also Conference Report* 296–97, *reprinted in* 1969 U.S.Code Cong. & Ad. News 2392, 2411; *House Report Part II* 18. To prevent this stratagem, Congress enacted § 4947, 26 U.S.C. § 4947 (1982), quoted in pertinent part in Part I.B. above, which provides, in essence, that an exclusively charitable trust is, for purposes of the private-foundation rules, to be treated as a § 501(c)(3) organization and hence, unless it falls within one of the exceptions of §§ 509(a)(1)–(4), a private foundation subject to the full panoply of private-foundation rules.

To be an exclusively charitable trust within the meaning of § 4947(a)(1), a trust must satisfy three conditions: first, it must not be exempt from taxation under § 501(a); second, all of the unexpired interests in the trust must be devoted to one or more of the purposes described in § 170(c)(2)(B); and third, a charitable deduction must have been allowed with respect to transfers into the trust. If only the first and third, and not the second, of these requirements are met, the trust is not a charitable trust. Rather, under § 4947(a)(2), it is a split-interest trust and is not treated as a § 501(c)(3) organization, although the private-foundation rules set forth in §§ 4941, 4943, 4944, and 4945 may apply; however, with respect to amounts transferred into the split-interest trust be-

fore May 27, 1969, none of the private-foundation rules apply.

There is no dispute in the present case that the Trust satisfied the first and third conditions of § 4947(a)(1). It has been stipulated, *inter alia*, that the Trust was not exempt from taxation under § 501(a), that Bodenwein's estate received a charitable deduction for the transfer of the Company stock to the Trust, that the Trust qualified for none of the exceptions to private-foundation status set forth in §§ 509(a)(1)–(4), and that all of the assets of the Trust were transferred into trust prior to May 27, 1969. Thus, the matter of whether the Trust was liable for the excise tax imposed by § 4940 turns on whether, within the meaning of § 4947(a)(2), "not all of the unexpired interests in" the Trust were devoted to purposes described in § 170(c)(2)(B).

### B. *The Company "Interest"*

The government attacks the district court's conclusion that the Trust was a split-interest trust because of the Company's interest in the Trust on essentially four grounds: (1) that the conclusion is contrary to the controlling decision in *Peters v. United States*, 624 F.2d 1020; (2) that the Company had no "interest[ ]" in the Trust within the meaning of § 4947(a) because the Trustees were authorized only to manage the Company and not to make distributions to it; (3) that in any event, since all of the income of the Trust came directly or indirectly from the Company's own operations, any payments by the Trust to the Company are merely the return of the Company's own income, not genuine trust distributions; and (4) that the ruling of the district court permits the Trust to escape the private-foundation rules solely by engaging in one of the very abuses that Congress sought to eliminate by enacting those rules. While some of these contentions present close questions, we conclude that the district court properly rejected them.

#### 1. *The Import of* Peters v. United States

The government contends that the ruling of the Court of Claims in *Peters v. United States*, 624 F.2d 1020, requires the conclusion that the Trust in the present case had no unexpired interest devoted to the Company. We find that the *Peters* court did not purport to answer that question.

In *Peters*, a series of trusts had been established, the corpora of which consisted of stock in the Allen-Bradley Company, a family-owned business. The trust instruments provided that income of the trusts was to be paid to certain individuals during their lives, and, upon their deaths, to the Allen-Bradley Foundation, a § 501(c)(3) organization exempt from tax under § 501(a). Thirty years after the deaths of certain other individuals, the trusts were to terminate and the corpus of each was also to be distributed to that foundation. The IRS ruled that, under § 4947(a)(1), each trust became a charitable trust upon the death of its individual income beneficiary and was thence subject to the tax on net investment income imposed by § 4940. The trusts paid the tax, and their trustees sued in the Court of Claims for refunds, contending that the trusts were not charitable trusts because one of the settlors' primary intentions in creating the trusts was to perpetuate family control of the business, a noncharitable purpose. The Court of Claims rejected this argument, stating that

> [in] so arguing, [the trustees] seem to urge that the inquiry is into whether the settlors' intent was charitable. A mere reading of the language of [§ 4947(a)(1) ] refutes [the trustees'] view.... The inquiry is simply into the nature of the beneficiary or beneficiaries of the unexpired interests. In the present case, for the tax years at issue the sole beneficiary of the unexpired interests was the Allen-Bradley Foundation, a § 170(c)(2)(B) organization.

624 F.2d at 1024.

Contrary to the government's contention, this ruling does not answer, but merely underlines, the question posed by the

present case, *i.e.*, whether the Company is a beneficiary of the Trust. There was no question in *Peters* as to what entities the settlors intended to make beneficiaries of the trusts. There was no indication that the trust instruments contained any provisions authorizing the trustees to manage the Allen-Bradley Company, to make any payments to that company, or to take any steps to benefit that company. There was no suggestion that, in the tax years in question, the Allen-Bradley Company, or indeed any other entity but the Allen-Bradley Foundation, was a beneficiary of the trusts. Since the only unexpired interests in the trusts were those of the Allen-Bradley Foundation, and since that foundation was devoted exclusively to § 170(c)(2)(B) purposes, the second requirement of § 4947(a)(1) was met.

In contrast, a central question in the present case is whether the Company, which the Will made one of the principal objects of the Day Trustees' stewardship, has an "interest" in the Trust. *Peters* merely stated that the nature of the beneficiaries is determinative; it did not address the question of how to determine whether a particular entity is a beneficiary.

### 2. *The Nature of the Benefit Conferred on the Company*

The government contends that the district court erred in concluding that the Company was the beneficiary of an interest in the Trust because, it asserts, the term "unexpired interests" as used in § 4947(a)(1) encompasses only income and remainder interests, the Trustees were authorized to provide only management services for the Company and not to distribute Trust income or assets to the Company, and the provision for such services is neither an income interest nor a remainder interest. Although we have some question as to whether the term "unexpired interests" as used in § 4947(a)(1) should be construed so restrictively, we need not resolve that question because the government's factual premise is flawed: as we read the Will, it not only instructs the Trustees to manage and operate the Company but also authorizes them to make distributions of Trust income and assets to the Company.

■ Although the question of whether particular rights, privileges, or expectations constitute "unexpired interests" within the meaning of § 4947(a)(1) is a matter of federal law, and it may be, as the government contends, that "unexpired interests" means only income or remainder interests, the questions of what rights, powers, and duties have been given to testamentary trustees and of what entities are income or remainder beneficiaries of a trust are matters of state law. Here, Connecticut law governs the proper interpretation of the rights, powers, and duties of the Day Trustees and the identification of any beneficiaries of the Trust, since the initial corpus of the Trust was property located in Connecticut, where the testator resided at the time of his death. *Grinnell v. Commissioner*, 70 F.2d 705, 706 (2d Cir.1934), *aff'd sub nom. Helvering v. Grinnell*, 294 U.S. 153, 55 S.Ct. 354, 79 L.Ed. 825 (1935); *see Lewis v. Rothensies*, 138 F.2d 129, 132 (3d Cir.1943).

■ Under Connecticut law, the interpretation of the rights, powers, and duties of trustees of a testamentary trust and the identification of such a trust's beneficiaries, like the resolution of most issues of will construction, is to be made "from an examination of the language of the will as a whole, including the ascertainment of the testamentary plan, in light of the circumstances under which the will was executed," *Rosa v. Palmer*, 177 Conn. 10, 13, 411 A.2d 12, 14 (1979); *see, e.g., Gimbel v. Bernard F. & Alva B. Gimbel Foundation, Inc.*, 166 Conn. 21, 26, 347 A.2d 81, 84 (1974); *Connor v. Hart*, 157 Conn. 265, 271, 253 A.2d 9, 14 (1968), and "[t]he cardinal rule in construing the terms of a will is to ascertain and effectuate the intent of the testator," *Knox v. Estate of Fredette*, 35 Conn.Supp. 34, 392 A.2d 502, 503 (Sup.Ct. Fairfield County 1978); *accord Connecticut Bank & Trust Co. v. Hills*, 157 Conn. 375, 379, 254 A.2d 453, 455 (1969); *Hartford National Bank & Trust Co. v. VonZiege-*

*sar,* 154 Conn. 352, 359, 225 A.2d 811, 814 (1966).

■ In the present case, there can be little doubt that Bodenwein intended the Trust provisions in the Will to benefit *The Day.* The newspaper is the first entity mentioned in the Will, where, in Article 1, Bodenwein stated his belief that a newspaper "should be more than a business enterprise" and his hopes that *The Day* would "become a recognized institution in the community, a leading factor in the growth, development, and improvement of the city and vicinity and the happiness and prosperity of the people." The vast majority of the Will's instructions to the Day Trustees related to the management and operation of *The Day,* and the Will provided that if the Company should cease to publish a newspaper in New London, the Trust was to terminate. The fact that the Trust would thus terminate if the Company chose to leave the New London area or to abandon newspaper publishing for a more profitable line of business gives proof that the purpose of the Trust was not simply to maximize either the Trust's income or the distributions available to the Foundation but was principally to further the longevity and success of *The Day* in the independent and public-spirited role that Bodenwein envisioned for it.

Further, the Will's detailed instructions as to how the Trustees were to manage the Company indicate that Bodenwein intended to authorize the Trustees to make income and principal distributions to the Company from the Trust. The Trustees were instructed to, *inter alia,* make provisions for new buildings and mechanical plants, to provide "liberal compensation and various forms of assistance and rewards ... to its employees," and to maintain reserves for all of the expenditures needed to see that *The Day* retained highly skilled employees and excellent facilities. The Trustees *qua* trustees, however, were merely stockholders of the Company. As stockholders, they had, under pertinent principles of corporate law, no responsibility for the day-to-day management of the Company, nor for its long-range planning and reserves, *see, e.g., Greenberg v. Harrison,* 143 Conn. 519, 523, 124 A.2d 216, 218 (1956); *Krall v. Krall,* 141 Conn. 325, 334, 106 A.2d 165, 169 (1954); Conn.Gen.Stat.Ann. § 33–313 (West 1960); *see also Maldonado v. Flynn,* 413 A.2d 1251, 1255 (Del.Ch.1980); Del.Code Ann. tit. 8, § 141(a) (1983); yet the Will plainly indicated that these expenditures were to be made, and the reserves to be maintained, by the *Trustees* and provided that all such expenditures were to be "at the discretion of said trustees." Thus, although the original assets of the Trust consisted solely of the stock of the Company and the Will was silent as to the details of transfers of funds by the Company to the Trust, the implication was that Bodenwein intended that the Trustees could elect directors of the Company who would cause the Company to pay dividends to the Trust, and the Trustees would then make such distributions to the Company as, in their discretion, they thought appropriate for use in enhancing its operations.

The government points out that, instead of making the authorized expenditures from funds held in the Trust, the Trustees have usually caused the Company to make expenditures and to retain reserves out of its earnings prior to declaring and paying dividends on its stock. This is in accordance with Bodenwein's evident intention that the Trustees manage the affairs of the Trust and the Company so as to minimize their tax liability. In our view, the fact that the Trustees have thus structured their supervision of the Trust's and the Company's operations so as to avoid multiple taxation does not alter the fact that the Will authorizes them to make distributions of income and assets from the Trust to the Company.

### 3. *The Provenance of the Distributions*

The government also contends that even if the Trustees are authorized to make distributions from the Trust to the Company, the Company nonetheless should not be considered a beneficiary of the Trust be-

cause the Trust holds substantially all of the Company's stock and has no other assets, and thus the Company itself is the corpus of the Trust. Thus, the government argues, any payments made by the Trust to the Company are, on the one hand, simply administration by the Trustees of the Trust's assets and, on the other hand, nothing more than the restoration to the Company of its own funds. We disagree on legal and factual grounds.

■ First, there is no impediment in the applicable law to a corporation's being the beneficiary of a trust whose assets include shares of the corporation's own stock. Generally, a corporation may be the beneficiary of a trust of property if the corporation has the legal capacity to take and hold legal title to such property. *Restatement (Second) of Trusts* § 116 comment *c* (1959); *see Proprietors of the White School House v. Post*, 31 Conn. 240, 258 (1862); *Alcoma Corp. v. Ackerman*, 26 Misc.2d 678, 680, 207 N.Y.S.2d 137, 140 (Sup.Ct.N.Y. County 1960); 2 *Scott on Trusts* § 116, at 885 (3d ed. 1967); 2 G. Bogert, *The Law of Trusts and Trustees* § 161, at 126 (rev. 2d ed. 1983). *But see In re Estate of De Forest*, 147 Misc. 82, 86, 263 N.Y.S. 135, 140 (Sup. Ct.N.Y. County 1933). Under Connecticut law, a corporation may "purchase, take, receive or otherwise acquire, hold, [or] own ... its own shares." Conn.Gen.Stat.Ann. § 33–358(a) (Supp.1984). Therefore it follows that a corporation may be the beneficiary of a trust whose corpus contains its own shares, *cf. Freed v. Judith Realty & Farm Products Corp.*, 201 Va. 791, 113 S.E.2d 850 (1960), and we are aware of no authority suggesting that that conclusion depends on the percentage of the corporation's shares held by the trust.

■ Second, we see no basis in the law for deeming the Company itself, rather than only its shares, to be the corpus of the Trust. The government's argument that the Company cannot be a beneficiary of the Trust simply because the Trust holds all of its stock would have us ignore the existence of the Company as an entity independent of the Trust and deem the corporation to be merely a collection of assets held and administered by the Trust. While, at times, both state law and the IRC abandon the notion of the separate identity of corporations for narrow purposes and in limited situations, *see, e.g., United States v. Reading Co.*, 253 U.S. 26, 62–63, 40 S.Ct. 425, 434, 64 L.Ed. 760 (1920) (where subsidiary is mere agent or instrumentality of parent, separate corporate existence of subsidiary may be ignored); *Weisser v. Mursam Shoe Corp.*, 127 F.2d 344, 348 (2d Cir.1942) (same); N.Y.Bus.Corp.Law § 630 (McKinney 1963) (largest shareholders liable for wage debts of insolvent corporations); IRC § 951(a), 26 U.S.C. § 951(a) (1982) (income of controlled foreign corporation deemed to be income of corporation's shareholder); IRC § 481, 26 U.S.C. § 481 (1982) (authorizing IRS to reallocate income among commonly-held businesses so as to prevent tax evasion), we are aware of no authority that for purposes such as those involved here the separate existence of a corporation should be ignored whenever all of the corporation's stock constitutes the entire initial corpus of a trust.

■ Nor do we think that ignoring the separate existence of the Company is appropriate in the present case, for we disagree with the government's implication that the stock of the Company constitutes all of the assets of the Trust. While the Trust's corpus initially consisted solely of the stock of the Company, the Trust receives dividends from the Company, giving it cash assets in addition to its stockholdings. Cash paid out as dividends is no longer the property of the Company; it is the property of the Company's stockholders. Further, the Will authorizes the Trustees to maintain reserves to be used, in the discretion of the Trustees, for the enhancement of the Company's operations; to the extent that the Trustees maintain such reserves, or to the extent that the Trust holds funds pending distribution, the Trustees presumably are authorized to cause the Trust to invest the funds held. Thus, the parties have stipulated that the assets of the Trust include income from dividends

paid by the Company "and income generated therefrom." Accordingly, payments to the Company by the Trust would be distributions from funds earned by the Trust through its dividends and its investments, and not merely the return of property belonging to the Company.

### 4. Policy Considerations

The government's final contention is that, by treating the Company as a beneficiary of the Trust and ruling that there is therefore an interest in the Trust devoted to non-charitable purposes, the court will facilitate one of the prime abuses that Congress sought to abolish, i.e., the compromise of the charitable ends of a private foundation in order to perpetuate a family business and to operate it at an advantage over its competitors due to the foundation's tax exemption. We are unpersuaded.

First, the government's argument misidentifies the basic thrust of the legislative scheme. What Congress sought to eliminate was the possibility that a trust purportedly established solely for charitable purposes, thereby enabling a donor to the trust to receive a charitable deduction for his entire contribution, could thereafter use some or all of its assets for noncharitable purposes. Congress did not enact the private-foundation rules in order to prevent the creation of a trust whose governing instrument makes both charitable and noncharitable entities beneficiaries; such trusts are clearly permitted under the IRC. Insofar, however, as the governing instrument of such a trust creates noncharitable beneficiaries, the trust's income, unless distributed, is taxable, see IRC §§ 641, 642(c), 651, and 661, 26 U.S.C. §§ 641, 642(c), 651, and 661 (1982), and a donor is either pro tanto or entirely denied charitable deductions for donations to the trust, see, e.g., IRC §§ 170(f), 2055(e), 2106(a)(2)(E), and 2522(c), 26 U.S.C. § 170(f), 2055(e), 2106(a)(2)(E), and 2522(c) (1982). Thus, insofar as such a trust operates within its charter, it does not engage in an abuse targeted by Congress.

The government identifies the conferral of benefits on The Day by the Trust as an abuse targeted by Congress because Bodenwein apparently received a full deduction for his bequest to the Trust. (The parties' stipulation states that for purposes of this case the Trustees "do not maintain that the estate of Bodenwein did not claim a deduction under Section 2055 of the Code or its predecessor on the estate's Federal Estate Tax Return for the value of the charitable contributions thereby made to the Trust.") The flaw in the scheme as applied here, however, is not in the ruling that the Trust, with its noncharitable beneficiary, is a split-interest trust but rather in the IRS's failure in 1939 to deny the charitable deduction to Bodenwein's estate to the extent that the Will indicated that the Trust was to be devoted to The Day.

There can be little question that if the Company were identified in the Will as an income or remainder beneficiary in haec verba, we would be compelled to rule that the Trust is a split-interest trust. That is the precise thrust of § 4947(a)(2). Since Bodenwein's Will indicates that the Company was intended to be a beneficiary of the Trust, and the Company is permitted to have that status under state law, we see no justification for treating an entity that is, in intent and effect, a beneficiary as not a beneficiary.

Further, the ruling that a trust is a split-interest trust does not automatically relieve it of all of the regulations imposed on private foundations, for § 4947(a)(2) makes even split-interest trusts subject to a number of the private foundation rules, including § 4941 (relating to taxes on self-dealing), § 4943 (relating to taxes on excess business holdings), § 4944 (relating to investments that jeopardize charitable purpose), and § 4945 (relating to taxes on taxable expenditures). The purpose of these provisions is not to preclude a split-interest trust from conferring any benefits whatever on noncharitable entities, for the charitable deductions allowed to donors to such a trust are limited on the assumption that some such noncharitable

use will be made of trust assets. Rather, these provisions are intended to prevent the trust from devoting a greater portion of its assets to noncharitable entities than its governing instrument provides. The very fact that in § 4947(a)(2) Congress made such provisions applicable to split-interest trusts indicates that Congress did not intend the mere potential for disproportionate noncharitable activities by a split-interest trust to lead a court to treat the split-interest trust as an exclusively charitable trust.

Finally, although the mere determination that the Trust is a split-interest trust does not free it from regulation under all of the private-foundation rules, it must be recognized that § 4947(a)(2)(C) contains a "grandfather" clause that makes all of the private-foundation rules inapplicable with respect to any assets transferred in trust prior to May 27, 1969. Since the present Trust received its corpus in 1939, it appears to be relieved of even the private-foundation rules to which more recent split-interest trusts are subject. Thus, notwithstanding any potential for abuse, the concerns of the government acting in its executive, revenue-collection capacity must yield to Congress's expressed intent that these pre-existing split-interest trusts be entirely free from liability under § 4947(a)(2).

## Conclusion

The judgment of the district court is affirmed on the ground that the Company has an unexpired interest in the Trust.